Satsang with Mooji Satsang with Mooji Satsang with Mooji Appellants present two fundamental errors. Was the jury incorrectly instructed as to infringement, either because it was required to make claim constructions in accordance with the opinions of one skilled in the art at the time of the invention, or because the district court incorrectly construed the Fiverr system's limitation, both of which infected the jury verdict, and either of which, an error as to either of which, would require that the jury verdict of infringement be vacated. The second error... In other words, the jury couldn't have, even if you're right on Fiverr systems, the jury could not have reached the conviction of non-infringement given the incorrect claim construction? That's correct. Let me just be clear about that. We have an undifferentiated non-infringement finding in the verdict, right? Correct. It's possible that the jury could have agreed with you entirely on Fiverr systems, but disagreed with you about one of the other elements. But we don't know that, so you need a new trial. You have a JMOL argument, which is a different argument from your new trial argument. Your basic claim construction argument about Fiverr systems is a new trial argument, because we don't know that that error wasn't the one committed by the jury. Correct. But if the jury instruction was incorrect on Fiverr systems, then the entire jury verdict on infringement is infected and requires that that jury verdict be vacated. Right, but that all by itself doesn't go the extra step of saying you're entitled to JMOL of infringement because no jury could possibly have found non-infringement. Correct. Now, these fundamental points, though, we never get to them if we agree with the jury and the district court that there's a basis for finding the claims in battle.  The second fundamental area, Your Honor, is with regard to did the district court misapply the law of written description. And with regard to that, first as to the plurality of openings, spinal kinetics does not defend the district court's rationale for reaching its decision. In the mechanical world, even a single embodiment will support a genus claim. And here there's no question that the species, that there was a species of peripheral grooves disclosed, which is within the genus of openings. Well, I understood their brief as defending the judge's analysis. The judge pointed, the district court judge here, pointed to evidence in the record, the testimony of Dr. Lee and another witness, and said this was, they didn't use the word unpredictable, this was the exception to that rule of genus species based on the testimony. And it was fair for the jury to believe those and to reach that conclusion. Am I wrong in what the argument is here, what the dispute is here? You're correct as to this issue of the Koski and Lee testimony. The point that I make is that the district court relied on two different aspects for the plurality of openings. One was the essential element. Spinal kinetics doesn't defend the essential element discussion. And the second aspect was, is that the spinal implant technology, like chemistry, and therefore there's a heightened scrutiny for evaluation of the species genus issue. They agree with our position, as stated in the area case, it is the aspect at issue that is the question for the species genus unpredictability issue. And then spinal kinetics then goes on and states that Mr. Koski and Dr. Lee supported this argument, but both of whom understood the differences between peripheral grooves and internal slots. But neither of whom testified or identified any evidence that these differences were unpredictable. One of the things that I think I remember noticing in your brief is that when you quote the testimony, I think it's Dr. Lee, yes, about the differences, you don't quote a word that he used in which he said that the differences are significant. Does that add anything to the sufficiency of his testimony to support the jury finding that not enough was disclosed in the specification to support your Honor claim? The answer is no, Your Honor. Whether he says differences or significant differences. And he said something about something mechanical properties, there's a prefix to mechanical, whatever it is. Right, he said, and on cross-examination, what he stated was that in internal slots, and what he was talking about was spinal kinetics specific design, and said if you have peripheral grooves, the fibers will be wrapped around toward the outside of the plate. Where if you have internal slots in their design, the fibers will be closer to the center. And as a result, the mechanical properties will be different. And on cross-examination, he admitted you could have deep peripheral grooves and you could have internal slots that were moved to the edge. And so that difference would be the same difference, simply depending on the construction of the grooves or the internal slots. So in fact, that difference wasn't a difference at all, and clearly that difference wasn't unpredictable, because he understood exactly what that difference entailed. And when you say the difference is not unpredictable, do you mean something like that the difference in fact between holes in the plate and grooves in the plate doesn't produce unpredictable differences in the desired properties of the device? That one skilled in the art would understand that you could, what you're doing here with the fiber system is joining it or anchoring it to the third and fourth plates. And one skilled in the art would understand that whether you wrapped it around the outside or you wove it through internal slots, you would still, those two, the two plates and the core would be joined together. That was not a difference. That was not the unpredictable difference. It was a difference. What was disclosed in the patent was the winding around the peripheral grooves and the way spinal kinetics made it was to weave it through the internal slots. Clearly a difference. But that difference doesn't make it unpredictable to anybody, and nobody said it was. Dr. Lee's testimony was focused to some extent on the words you just used, which is that the grooves in the patent were on the periphery. And he said that it would make a substantial difference in the biomechanical properties of the device if the grooves were somewhere other than on the periphery. So isn't it a combination of the fact that you're not just using grooves, but you're also using slots that are more internal? As I stated, Your Honor, during the cross-examination, because it was unexplained, it was just that conclusive restatement that was made by Dr. Lee during his direct examination. And during his cross-examination, the question was to try to understand what that difference was and the significance of that difference. And it was clear that it was simply where the fibers would pass these around plates and where the fibers would pass through it. And if you took a peripheral groove and you just deepened it, the fiber would pass through at the exact location. But you keep referring to your cross-examination. I mean, you have a problem with the standard of review that we're going to be applying here. The question is whether or not there was evidence upon which a reasonable juror could rely. They might not have been persuaded by the, you know, you might have thought your cross-examination was powerful, but perhaps the jury didn't. And perhaps the jury relied on the very testimony that the district court judge pointed out in finding that it did make a significant difference. And my position is even if the jury found that it was a significant difference, that isn't clear and convincing evidence of unpredictability. And the test is unpredictability. And where this court has looked at that issue most closely is in the... Is that a question of law or a question of fact? What is unpredictable and what is not unpredictable? Well, what I suspect, Your Honor, is that if there is evidence, if there's testimony that it is unpredictable, it could be a question of fact. But here, my position is that there was no testimony whatsoever on unpredictability. What spinal kinetics does is take testimony that talks about a difference and then tries to squeeze it into the evidence into the unpredictability law. And it did that rationale all after the trial. Can I just... I want to come back to the question because it seems to me part of what is somewhat confusing or less than clear here is that what this notion of unpredictability is, what is unpredictable based on what? I tried to give you one possible idea. Namely, everybody recognizes that there could be quite significant differences between certain holes and grooves and whatnot, but it's utterly predictable what the consequential differences, those structural differences would make for the properties, the desired properties of the device. Is that what we're talking about? Exactly. Because the language of unpredictability is not yet precise enough to be able to know what we're talking about. Unpredictable as to what? Unpredictable as to how the device can be constructed and will work. And here... And so your point, just to be clear, Dr. Lee never said there are big differences between grooves and holes and nobody would have any idea what the effect, or it would be tremendously expensive to do lots of experimenting to find out what the effect of those differences would be on whether you could use the thing as a disc replacement. Precisely. In fact, he knew what the differences would be. Okay, I'm a little confused now, and I understand that. It seems that, at least to the extent we're looking at the Bilstad case, the court seems to have defined unpredictability for us, not that that makes it a lot easier, but they talk about the genus would perform similarly that one skilled in the art would not readily discern, that's what makes it unpredictable, that they could perform similarly. But it seems like Judge Toronto's question gets to function-way results. I mean, are you saying that if the result is the same, that means they've satisfied performing similarly? Isn't it the way, not just the result? And if they perform in a different way, isn't that unpredictable? No, of course not, because if that was true, then in the mechanical arts, the whole body of law that states that if you disclose a single species, you can broadly claim your invention to the genus. And that can't be correct, Your Honor. The issue of unpredictability, which has traditionally been applied in the chemical or biochemical arts, not in the mechanical arts. In the mechanical arts, the law has historically been that a single species is enough for a genus. But here, when you have an expert who testifies, that's the only evidence that there is, because Mr. Kosky wasn't even talking about the patent. He was talking about the spinal kinetics commercial device, when the only evidence is really Dr. Lee's testimony. And he fully understood, well, they're different, but he fully understood the difference. Then you cannot have unpredictability without doing away with that entire body of law. Well, you're well into your rebuttal time, so why don't we save that for you. Thank you, Your Honor. And let's hear from, is it Mr. Dickerson? It is, Your Honor. Thank you, Your Honors. Good afternoon. I'll jump right in first with this issue about openings and whether or not there was sufficient written description. And as Judge O'Malley noted, the standard review here is De Novo applying the same test that the District Court did, because it's in the Ninth Circuit, it applies that test. So it's a fairly tough standard that they have to meet, and that is, looking at the evidence, in the light most favorable to spinal kinetics, does that evidence permit of only one conclusion? Sure, but this is all made more difficult. I looked at the jury instructions, and I didn't see any reference to the standard of unpredictability. Am I right about that, that there was no reference to that? That's correct. There's no reference to the standard for unpredictability in the jury instructions. Was there a request for such instructions? No. So who suffers the consequence of that? I mean, the jury didn't necessarily, there's no reason to believe that they looked at this, they evaluated Dr. Lee's testimony in the context of whether or not this ultimately led to the fact that it was unpredictable or not unpredictable. What do we do with that? What do we do with that? I think that we have to go back to the law and recognize that unpredictability is not a sine qua non to a finding of lack of written description. I mean, that's sort of what they're briefed. Put aside the cases like Gentry and Tronzo, in which you look at the spec and the spec tells you, this is really, really central to our invention, and then you're not going to get around that by claim. Put aside that kind of evidence in the spec itself. Are there other situations where there's a written description problem without the premise that what is described, that the difference between what is described and what is claimed involves reaching for coverage as to which you just could not predict whether the extra stuff would work, would work as well, would be harmful, would serve the purposes of the invention. I thought that that was the core reason that in the biotechnology and the chemical areas that that's the fundamental work the written description doctrine does, that you find one species, you don't know if the species next door is worth a thousand on the block. So kill me is going to work. That's correct. And that's critical here, Your Honor, because I had such a case, there's a whole bunch of them where they didn't even discuss mechanical cases, but they did discuss predictability. But here, even though this is, yes, a mechanical device, this is not some simple mechanical device that's going to sit on your desk. This is going into your back. This is a small device. They want to denigrate and say that Mr. Kosky's testimony is irrelevant. It's not, and why isn't it irrelevant? You look at the invention. What are they claiming? The preamble to the claim is an intervertebral implant to be placed, inserted, implanted, between vertebral bones. This is going into the human body. Did Dr. Lee testify that the differences between holes and grooves, putting aside everything else, produced unpredictable effects on whether the thing would work? He did not use those words precisely. So it's consistent with his testimony that, for example, he could say, well, sure, if you put the hole very close to the center, you're not going to have enough room for the squishy stuff in the middle, and so you would never do that. I can predict that you wouldn't do it. Big difference, but I know exactly what not to do. He didn't use those words exactly, but contrary to what Mr. Olson said, it was not just an unexplained opinion. He came down off the stand, drew drawings on an easel, and explained his opinion as to why these were significant, substantial changes. Their argument that you can just go to great big grooves... They didn't say you can go to them. They said, explain what the difference is between the grooves and the holes, and he said, oh, the distance from the center. He said, you can have the same distance, grooves, and holes, so what other difference is there? Now, I don't know that that has anything to do, in fact, with this missing testimony about predictability, but... Well, again, there's nothing that says, nothing in the case law on this predictability. One says it has to be unpredictable. It has to be found, or that there's some talisman that somebody has to get up and say it's unpredictable to make that finding. You can base it on the evidence. The jury can reach that conclusion. The judge can reach that conclusion on his general decision here, and I do want to get, because it is important, to get to Mr. Kosky's testimony here on this. His testimony was that Spinal Kinetics spent a long time trying to develop something with peripheral grooves. He never actually said 10 months, though. You quoted him as saying 10 months, but he didn't quite say that. I mean, I know there were exhibits that would sort of maybe give you a timeline like that, but he didn't actually say that. The 10 months goes from when they finally decided that the peripheral groove design didn't work, and they had to make a change, a radical change in their thinking. They were with a... I'm sorry. No, no, this seems to me important, so I wanted to ask you, and I probably should be more familiar with the record. I certainly had the sense that there was a 10-month development project, and at the beginning they had a bruise, and at the end they had holes. I don't remember seeing, so I'd like you to point to me, point me to anything that says the whole groove difference was an important element of what it took us 10 months to solve, as opposed to you had the grooves at the beginning, you had the holes at the end. It could have been an utterly trivial afterthought. Is there testimony that... I remember reading it. I guess I... Some of the things... I don't remember seeing that. Some of the things that he testified about that they had to think about. For example, when you go from these peripheral grooves to holes in the interior, you're immediately reducing the amount of surface area in those places. These devices pack a lot of functionality, durability, capability into a very small area. As I said, this is a very complex device. So the first thing they had to decide, would they be able to do that? Would they be able to come up with a design of the holes in the interior that wouldn't so reduce the surface area that it just wouldn't work? It's important, and I think really critical here, to recognize that when they finally did come up with interior holes, they came up with different designs and placements with respect to the lumbar disc as they did from the cervical disc. It's not just like, okay, we're just going to throw some holes in the middle and we're off to the races. You have to figure out what's going to work, what's the balance. This is a very balanced product. This product... Can I just ask? I mean, this does seem to be awfully important, so I just want to ask one more time. Is there anything that, right as you stand there, you can point me to a specific page on these... A specific page, specific line numbers? I'm sorry, Kevin. Okay, so I'll just rely on whatever is in your record. In the briefing. I'm sure that I know what's cited there. So, with respect to that testimony, that certainly provides, along with Dr. Lee's testimony, a basis for finding unpredictability, if we even have to find unpredictability here. The test, obviously, the ultimate test is whether or not a reasonable person of skill in the arts, reviewing the patent application as filed, it would reasonably convey to him that the inventors had possession of the later claimed subject matter at the time of filing the original application, and Dr. Lee testified that he reviewed the patent carefully with that inquiry in mind that confines no evidence of it. And let's go to the patent for a second. Again, we start with the four corners of the patent here. They admit there's nothing in there that discloses other than peripheral grooves. I don't, really, they admit that? Yeah, there's nothing in there. Wait a minute, there's two separate propositions. One, that they admit it, and two, that it's true. Do they admit that there is nothing in here? It's certainly true. What they cite, I'm going to tell you, the only thing that I saw in the briefs that they cite was a statement that says... Well, let me just ask you. Column three is where they list a whole bunch of embodiments, right? And one of them says, in yet a further embodiment, the fiber system is guided over the external surfaces of both cover plates so that it will surround the central part as well as the cover plates. Nothing in there about grooves. Nothing in there about holes. Nothing in... About interior holes. That's not what we're talking about. And then what you're going to surround... There's no doubt that there's nothing in here specifically about holes through. But it's a different proposition to say that every one of these talks about having grooves. There's also the interlocking... I'm sorry, Your Honor. I didn't mean to interrupt. The key here is not whether it's just grooves. It's around the periphery. That's really... It's the location. Grooves are part of it. The only thing that they really talk about is grooves. What about the channels mortised in the external surfaces of the cover plates? There's nothing about periphery there. What those are are not holes. Those are on the top plates, just channel... Mortising some channels so that the fibres were laid flat in the top section. That's all. There's nothing in there about holes. The only thing that they really cite about that is that there's an indication that more than this periphery, whether it's grooves, whether it's whatever, but it's on the periphery of the plates. The only thing they cite to in the brief is this amorphous statement about, of course, there are other ways to attach the fibre system to the plates. That's way too thin a reed when you take into consideration Dr. Lee's testimony, Mr. Kosky's testimony, and the point, the 10-month point, I wanted to come back to that. You have to put together Mr. Asphalt's testimony with Mr. Kosky's testimony to put together that 10-month period of time from when they made the decision to go from peripheral grooves to internal slots. That was the 10-month period of time. What I was referring to was that spinal kinetics spent a lot of time and money before that with a design that had peripheral grooves and then found out this doesn't work. Now, spinal kinetics says that all that testimony, Mr. Kosky's testimony, can be disregarded because it just goes to what spinal kinetics had to do to make a workable product. But when you see that what the invention is is a spinal implant that's going into people, testing, design challenges, whether we're going to get there to come up with a marketable product, a useful product, as claimed, is clearly relevant. I kind of wanted to move on to a different topic, but we've still got questions on this one. Okay. The next topic I want to address related to this issue of anchored and whether or not there was sufficient evidence for the jury to find that there was no infringement because the fiber system was not anchored to the third and fourth place. Same standard as before. This is one of the areas where Cynthia argues that there was an incorrect claim construction and claim... Can I just interrupt your thought? Sure. Do you disagree? The first question out of the box to Mr. Olson had to do with if we find one thing, we don't find the other. Leaving aside the description issues, which obviously are threshold issues. If we get to infringement and we disagree with the district court's claim construction about fiber system, isn't that in and of itself enough to require a new trial irrespective of the anchor? No, because all of these bases were presented to the jury for non-infringement. It was a non-differentiated jury verdict. So any basis will be sufficient. And clearly anchored is sufficient. But what about then cylindrical, substantially cylindrical? If we conclude that the only thing right about the jury verdict in the claim construction was substantially cylindrical, which was ordinary meaning, claim construction, I recall, do we still have to affirm the jury verdict because we have to assume that's what they concluded it on? Do you have a case to support that? I don't have anything off the top of my head to support that, but it just makes sense. Why would you reverse and send back when the jury's verdict of non-infringement has been affirmed? What are we going to talk about at trial? We have a patent. We only need to find that the jury had sufficient evidence for a reasonable juror to conclude that one of the limitations had not been set. That's right. That's correct, Your Honor. But if, for instance, Judge Crow's hypothetical is correct, that say it's the cylindrical piece, the substantially cylindrical that we concluded is the only real hook for the jury to find non-infringement, but we disagree with the trial court's jury instruction as to what kind of meaning they were to give to unconstrued terms, then what do we do? I still think, Your Honor, that you have a jury verdict of non-infringement. You have a basis for non-infringement that is unaffected. Besides, I'll go beyond that and address... I'm sorry, my time has run out. I'll conclude this thought. In the cases that we cited, in order for this jury instruction argument issued to require a remand, there has to be some prejudice. In the function media case, the function media case really talks about this and says this is really an argument there has to be prejudice. There has to have been a different result obtained. None of that applies here. So I do believe, Your Honor, that certainly if you find any one of the basis for non-infringement survives, we're fine. On this anchor, there's only one last thing I'd ask you to do in your review. I'd ask you, as part of your review, to go to the bottom paragraph in the spec that starts at the bottom of column 3 and goes to the top of column 4. There, they're talking about fixing the spinal implant in the spine, how they do it, and the point I'm making there is that if there's ever a situation where you don't want slipping, you don't want the implant slipping out of the spine. That's a no-slip situation. The language they use there is mechanically anchoring the implant. Anchoring was used consistently, certainly there to be a no-slip situation. No-slip is non-anchored. That's what the M6 device fibers are. I've gone way over my time. I apologize. Thank you. We'll add two minutes, Jerry. Thank you. With regard to the last comment, the judge's instruction didn't include no slipping. That was a specialized narrow construction proposed by a spinal kinetics expert at trial. With regard to the question about if there is an error in the jury instruction, does the jury infringement verdict have to be reversed, it has always been the law that if there is an error in the jury instruction, with regard to any theory for a verdict, where there's a general verdict that rests on multiple theories, that that verdict has to be reversed. As long as the jury could have found the other way around the issue. And then they spent half the trial talking about this concentric business and the pressure points, and all of that would simply go away if you were right about fiber system.  If there's an error in fiber system, the entire verdict has to be reversed. And the jury could have relied on what they spent half the trial talking about. They could have relied on their expert, absolutely, Your Honor. In the case, actually, I'm pointing to the Sunkist, the Supreme Court case. And I know we haven't talked much about this, but putting aside the fiber system construction, your argument about the instruction to the jury, that instruction applied only to claim terms not construed. It seems to me, tell me why I'm wrong about this, that as to two of your three claim issues, the fiber system and the received joint, that jury instruction is simply immaterial, because it didn't tell the jury how to interpret the terms of the construction. It does apply to the substantially cylindrical, but when they overstepped the bounds of that, the judge basically took curative action. So I don't really understand how that jury instruction, even if it were wrong, actually applies to your case. A couple of points. The district court, if what you say is true, then the district court provided no explanation whatsoever. But I don't believe what your conclusion is accurate. I believe that when the jurors are instructed as they were instructed, the judge's claim construction are, in a sense, viewed as terms of the claim. And the best example of that, Your Honor, is at 39 in our blue brief, where the jurors actually asked a question during their deliberations. The jurors deliberated for four days, and during those deliberations they asked a question, why was the word joined changed to anchor? And so you can read that, jury, and I think that's a fair reading of the instruction, that the court's claim constructions are, in effect, terms of the claims that they were free then to interpret, or not free to interpret, but required to interpret in accordance with that instruction. They were left with no alternative. They weren't left with the alternative that for terms that, for my construction, that those terms should be interpreted in accordance with the plain and ordinary meaning. They were only given that one choice. And so I think they applied it. I think it's reasonable to conclude that they applied it to both the terms of the claim and the court's constructions. Now, I did want to make one comment with regard to the instruction, Your Honor. You asked a question of counsel as to whether this was in the jury instruction. It was not in the jury instruction. You can search the record, and there was no mention of the species genus distinction in the unpredictability issue until after the trial. That was the first time it was raised. Their position was, our M6 device is different than what's disclosed, and therefore, that's not written description. What happened was that it was clear that that was an incorrect position of law, and so post-trial, the first time it rose, and that's why it never got into the jury instruction. We have your argument. We thank both counsel. The case is submitted. Thank you. Afternoon. All rise.